IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| Tony R. Whisenant, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-18-819-D |
| OXY USA, Inc., | ) ) ) | |
| Defendant. | ) ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff, Tony R. Whisenant, brings this claim on behalf of himself and the class of all other persons similarly situated (the "Class Members") against OXY USA, Inc. ("OXY") and, in support of these claims, states as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings claims based upon OXY's prior underpayment or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells in Oklahoma through improper accounting methods, all as more fully described below.

### VENUE AND JURISDICTION

2.      Tony R. Whisenant is a Mineral and Royalty Owner in the Whisenant 3-6 well in Beaver County, Oklahoma, which OXY owned in part, operated, and paid royalty on during the Class Period.

3.      The original class action petition in this case was filed on June 13, 2017 in the District Court of Beaver County, Oklahoma and assigned Case No. CJ-2017-2. Plaintiff filed

the first amended class action petition in Case No. CJ-2017-2 on October 6, 2017. On August 9, 2018, the district court entered its Journal Entry granting Plaintiff's motion to file his second amended class action petition. On August 24, 2018, before the filing of the second amended class action petition, Defendant OXY removed the case to this Court. Thereafter, by order dated January 29, 2019 [Doc. 20], the federal court directed Plaintiff to file this Second Amended Class Action Complaint.

4.    OXY has removed this case claiming jurisdiction over this matter under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d), in that it is a putative class action in which (1) the aggregate amount in controversy exceeds $5,000,000; (2) any member of the plaintiff class is a citizen of a state different from any defendant ('minimal diversity'); (3) the primary defendants are not states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief; and (4) the number of members of the plaintiff class is 100 or more." [Doc. 1 at ¶6].

## **PARTIES**

5.    Plaintiff has a royalty interest in a well in Beaver County, Oklahoma. OXY owned in whole or in part, a working interest in the well and directly paid royalty to Plaintiff. During some or all of the relevant times, OXY operated the well.

6.    Defendant OXY USA, Inc. ("OXY") has admitted that it is a Delaware corporation with its principal place of business in Texas. Defendant was served by serving its agent for service in Oklahoma.

7.    OXY is in the business of producing and marketing gas and constituent products from the wells in which Class Members hold royalty interests. Occidental Energy

Marketing, Inc. ("OEMI") is in the business of marketing natural gas and natural gas liquids, including for its affiliated company OXY. Both OXY and OEMI are owned by Occidental Petroleum Corporation.

8.    The acts charged in this Complaint as having been done by OXY were authorized, ordered, or done by officers, agents, employees, or representatives, while actively engaged in the conduct or management of OXY's business or affairs, and within the scope of their employment or agency with OXY.

## CLASS ACTION ALLEGATIONS

9.    Plaintiff brings this action individually and as representative of a Class defined as follows:

> All royalty owners in OXY operated wells (or non-operated wells where OXY marketed its share and paid royalty owners directly) located in Oklahoma from January 1, 1990 to April 1, 2014.
>
> Excluded from the class are: (1) Office of Natural Resources Revenue f/k/a the Mineral Management Service (Indian tribes and the United States); (2) OXY and its affiliates, employees, officers, and directors; (3) Any oil and gas exploration and production company and its affiliated entities; and, (4) royalty owners to the extent that the lease creating the royalty interest expressly and unambiguously authorized midstream deductions by language in the royalty clause that says "minus" or "less" and then specifies gathering, compression, processing, or marketing; and, (5) all royalty owners to the extent of any settlement of their claims with OXY, if any.

10.    The action is properly maintained as a class action under Fed. R. of Civ. P. 23(a) and (b)(3).

11.    The Class Members are so numerous and geographically dispersed that joinder of all members is impracticable. It is believed that there will be hundreds of royalty owner Class Members dispersed throughout Oklahoma and the United States.

12.    OXY has within its possession or control records that identify all wells marketed under the same gas contract as the gas produced from Plaintiff's well and all of the royalty owners in those wells.

13.    The questions of fact or law common to Plaintiff and the other Class Members include, without limitation, one or more of the following:

(a)    Are Plaintiff and the other Class Members the beneficiaries of an implied covenant obligating OXY to prepare the gas (and all of its constituents) for market at its sole expense?

(b)    If so, where is the market for the gas from Class Wells?

(c)    Did OXY's uniform practice of paying royalties based on the net, instead of the gross, gas contract value constitute a breach of OXY's implied duty to market obligations to Plaintiff and the other Class Members?

(d)    Did OXY contract with its affiliate OEMI to allow their parent company to receive a higher price for residue or NGLs than Class Members?

14.    Plaintiff is typical of other Class Members. OXY pays royalty to Plaintiff and other Class Members using a common method.

15.    OXY pays royalty based upon the net revenue OXY receives under its gas contracts.

16.    The gas contract terms are unknown to, and unapproved by, royalty owners.

17.    The gas contracts are necessary to place the gas and its constituent parts into Marketable Condition.

18.    Plaintiff and the other Class Members are also typical because their leases do not contain an express provision that "spells out" authorized midstream service deductions of all gas conditioning costs to convert the gas into Marketable Condition.

19.    Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is a royalty owner to whom OXY paid royalty and understands his duties as Class Representative. Plaintiff has retained counsel competent and experienced in class action and royalty owner litigation.

20.    This action is properly maintainable as a class action. Common questions of law or fact exist as to all Class Members, and those common questions predominate over any questions solely affecting individual members of such Class. There is no need for individual Class Members to testify in order to establish OXY's liability or even damages to the Class Members.

21.    Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by the Class Members. Class action treatment will allow many similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts and/or OXY. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class Members.

22.     Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by the Class Members, because joinder of all Class Members would be either highly impracticable or impossible, and because the amounts at stake for individual Class Members, while significant in the aggregate, are not great enough to enable them to enlist the assistance of competent legal counsel to pursue their claims individually. In the absence of a class action in this matter, OXY will likely retain the benefit earned by its wrongdoing.

## GAS INDUSTRY BACKGROUND

23.     The Class Members own interests in wells that produce gas and constituent products that are subject to uniform accounting methods and to applicable implied marketable product law which requires the lessee to bear all costs of placing the products, whether gas or its constituent parts, in Marketable Condition.

24.     The lessee under an oil and gas lease has the duty to produce marketable products, and the lessee alone bears the expense in making all products marketable. Gas and its constituent parts are marketable only when in the physical condition to be bought and sold in a commercial marketplace.

25.     Only after a given product is in marketable condition does a royalty owner have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

### The Lessor-Lessee Relationship

26.     The lessor owns minerals, including oil and gas, and the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor

and lessee enter into a lease that allows the lessee to take the minerals from the lessor's land. The usual revenue split from a well was once 1/8 to the lessor (royalty owner) and 7/8 to the lessee. As the risk of finding oil and gas lessened over time due to the prevalence of wells delineating the field, better seismic technology to locate oil and gas, and increased efficiency of drilling rigs, royalty owners on more recent leases have received 3/16 or even 1/4 of the revenue. In this case, Plaintiff's lease provides for royalty as follows:

> To pay lessor for gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom, 3/16 of the gross proceeds received for the gas sold, used off the premises, or in the manufacture of products therefrom, but in no event more than 3/16 of the actual amount received by the lessee, said payments to be made monthly.

27.     But oil and gas companies have tried to keep as much of the well revenue as possible. Rather than adopting complete transparency in its royalty calculation formula, OXY, like most lessees, has guarded its production and accounting processes as confidential or proprietary; thereby depriving the royalty owners of critical information to determine exactly what and how much is deducted from their royalty.

28.     If one or more of the royalty owners learn of a lease breach, the royalty owner has only three – all poor – options: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from thousands of other royalty owners; (2) do nothing since the underpayment results in only a modest yearly loss to the royalty owner, and individual litigation is too expensive to pursue under those circumstances; or (3) file a class action lawsuit which will last for years and probably will not recover the full loss. In short, if lessee breaches, it may never be held accountable, and

if a royalty owner complains, the lessee will still come out ahead, because an individual case is not worth much and a class action rarely requires a full repayment to royalty owners plus pre-judgment interest, plus attorneys' fees and expenses. The class action is the best of the options; hence this suit.

### Residue Gas, Helium, Nitrogen and Natural Gas Liquids Production

29.     The gas is gathered from each well, dehydrated and compressed, through gathering lines that are buried underground and cross many miles of land. The three primary raw gas products—methane, natural gas liquids ("NGLs"), and helium—are further processed at processing plants before being trucked or piped to the commercial market and on to the end-user.

### Wellhead (Basic Separation and Gas Measurement)

30.     The diagram below illustrates the on-lease gas conditioning process.



Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc., all mixed together in the gas stream.[1] After the stream comes out of the ground, it enters the free water knockout (a/k/a three-phase separator) which separates the products via gravity; water at the bottom, oil in the middle, and gas going out the top. Due to the low technology, the separator is not expensive. The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[2] The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives and electric current break down the mixture more clearly into oil and water. The heater-treater is installed, maintained and takes fuel to operate. The water is drained off and sent for salt water disposal. The oil that is separated at the wellhead is collected in a tank, usually trucked out and sold. (The payment of oil royalties is not at issue in this lawsuit.)

31.    Since the pressure of many wells has depleted over decades of production, sometimes wellhead compressors have been installed to suction gas out of the well or to move the gaseous mixture. These wellhead compressors are installed, maintained and use fuel. The gaseous mixture produced from a single well cannot be processed economically,

---

[1]    Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from a pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas."

[2]    A minute portion of this raw or mixed gaseous product may be used on a few leased lands to heat the farm house pursuant to a free gas clause in the lease or sometimes sold to a small, limited local market with a finite demand to local irrigators near the wellhead. This limited local market accounts for less than 5% of a producer's gas production.

so the mixtures are "gathered" together through gathering lines and the aggregate mixture is put through a processing plant.

### Gathering Lines (Dehydration, Compression, Drip Condensate)

32.    As the gaseous mixture from each well enters the gathering line it is measured, in both volume (in Mcf) and quality (Btu content) (combined, "gas measurement," in MMBtu). This is done in a meter run, which must be constantly maintained to preserve accuracy. Gathering pipelines are made of metal that could be corroded by any remaining water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water vapor. Of course, gas cannot move unless it is pressurized, so large gas compressors are installed to move the gas down the gathering line. The gas must be pressurized at a high enough level to overcome the back-pressure in the line and friction. These compressors are expensive and require fuel to operate. The gathering pipelines themselves cost money to lay and maintain. Gas condensate (gas condensed into liquid as it cools) ("Drip Condensate") is collected at points along the gathering lines as a result of cleaning or "pigging the line" and is captured for fractionation later. Finally, gathering lines leak, especially as they age, resulting in lost and unaccounted for gas ("L&U").

### Natural Gas Processing

33.    Once the gas mixture is gathered from enough wells (and often from multiple gathering systems), it enters the inlet of the processing plant. To process the gas into methane, crude helium, and mixed NGLs, lessees, such as OXY, use gas processing plants. Sometimes the processing plant is owned by an unrelated third party and sometimes it is

owned in whole or in part by lessees. Sometimes other impurities in the mixture must be removed such as carbon dioxide, nitrogen, or sulfur. Methane gas (sometimes called "residue gas") must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission (FERC), which is called "pipeline quality gas." NGLs are used as a feedstock in the petrochemical and oil refining industries and are worth more than methane. NGLs are separated from the gaseous mixture by cooling the mixture until the NGLs become separated. This cooling or Cryogenic recovery method usually takes place at temperatures lower than minus 150°F (the "Cryogenic or cooling process"). The mixture of NGLs is further moved down a liquids pipeline and processed by a fractionator for separation of the NGLs into their component parts ("T&F" or "fractionation"). Helium is processed into a crude mixture known as "raw helium" or "crude helium." Raw helium contains impurities and must be further processed into Grade A helium for commercial sale and use. This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel").

34.    At the tailgate of the processing plant, at least four products emerge: (1) crude helium; (2) residue gas (or methane gas); (3) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade); and (4) nitrogen and other products. None are commercially marketable at that point.

## Marketable Condition for the Products

35.    *Helium.* Crude helium (about 50% to 80% pure) has little commercial use; instead, it must be further processed into Grade-A helium (99.9% pure). The crude helium

from the processing plant is then piped to one of the Grade A helium processing plants.

36.    Helium is an element with no Btu content and will not burn. The gas streams from Plaintiff's well and those of other Class Members contain helium. Helium is extracted at the processing plants, but OXY does not pay royalty at all, or not completely, on the helium from Plaintiff and Class Members' wells.

37.    ***Methane Gas.*** Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor.

38.    ***NGLs.*** The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products—ethane, propane, butane, iso-butane, natural gasoline, etc. OXY improperly deducts, in computing royalty for NGLs, processing fees and/or other costs (such as transportation and fractionation, T&F) needed to reach commercially marketable fractionated NGLs. Such deductions are improper.

39.    ***Nitrogen and other Products.*** Nitrogen is produced and processed without payment of royalty, and Plaintiff and Class Members are entitled to royalty on nitrogen produced from their wells and used or sold. The same is true of other products, such as Drip Condensate which falls out from cooling on the gathering line.

**Sale of Products**

40.    To turn the gas products into money, the producer must sell the valuable gas products. One would expect that such sales would occur in the commercial market place in arm's length transactions. That, in fact, occurs, but some lessees attempt to cover up and

manipulate that fact using self-serving language in gas contracts about title transfers to manufacture a fictitious incomplete "sale" before the raw gas reaches commercial quality for sale.

41.    The "starting price" for gas products is established by the lessee in the gas contracts as a "weighted average sales price" or an "index price." The gas contracts must mark to the actual market for pricing, and they do. The gas contracts also pay for services in various ways, usually by fees (and some in-kind payments for FL&U, drip condensate, and plant fuel) for midstream services, and sometimes all or part of the commodity risk during the gas contract term is transferred to the midstream service provider as well (in POP or Keepwhole gas contracts).

### Different Ways OXY Underpaid Royalty Owners

42.    The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship constantly tempt lessees to wrongfully retain gas revenues. All payment formulas, contractual relationships, and all calculations are exclusively in the control of lessees, and they involve undisclosed or only vaguely disclosed accounting and operational practices. As a result, there are many ways royalty owners are underpaid on their royalty interests, and they never know the details.

43.    OXY represented the royalty calculation on the form of a monthly check stub it sent to each royalty owner. The check stub showed each royalty owner's interest and taxes (which are not in dispute here), and volume, price, deductions, and value, all of which are disputed (and are represented on the check stubs as gross values when they are in fact net values). The check stub could have accurately accounted to royalty owners in much the

same way that midstream providers accounted to OXY, but it didn't. Instead, OXY consistently covered-up the midstream deductions, in-kind and monetarily, that it has taken, with no feasible way for royalty owners to know they were being cheated.

44.    OXY underpaid Plaintiff and the other Class Members in the following ways:

(a)    ***Helium.*** Helium is contained in the well-stream produced from Plaintiff's and the Class Members' wells, but OXY: (i) failed to pay royalty for all of the helium produced (some is lost and unaccounted for in the gathering process and some is used for fuel); (ii) deducted processing fees and costs even though the helium is not yet in commercial grade; and (iii) paid at a lower than commercial Grade A price.

(b)    ***Drip Condensate.*** Plaintiff's and Class Members' wells produce heavy hydrocarbons that condense in the gathering line and that OXY (or its gatherers, on behalf of OXY) recovered, but OXY failed to pay any royalty for that Drip Condensate.

(c)    ***Natural Gas Liquids (NGLs).*** OXY: (i) failed to pay royalty for all of the NGLs produced (some is lost and unaccounted for in the gathering process); (ii) deducted processing fees and expenses; and (iii) reduced payment by T&F, all before obtaining commercially marketable fractionated NGLs. NGLs should have been paid on a fully fractionated basis and only on arm's length sales.

(d)    ***Residue Gas.***

(i)    The starting price paid for residue gas should be an arm's length, third party sales price for residue gas at pipeline quality, but

instead of paying on that gross competitive price, OXY paid on a net price after taking, or allowing to be taken, gas contract deductions.

(ii)     The volume paid to royalty owners and reflected on their check stubs was less than the volume actually produced from the wells because, among other things, OXY improperly deducted in-kind gas used in gathering and processing, and lost gas in the gathering line;

(iii)    Deducting (in cash or in-kind) costs for placing the gas in Marketable Condition, such as midstream services (a/k/a post-production) gathering, compression, dehydration, treatment, processing (GCDTP), or other deductions was improper, and the check stub reflected $0.00 deductions taken by OXY, but deductions are in fact made without specifying for what or how much.

(e)     ***Affiliate Sale.*** Early in the Class Period, OXY obtained the highest and best starting price for Residue and fractionated NGLs by selling to third parties in arm's length transactions, but at some point during the Class Period, it is believed that OXY started selling almost all of the Residue at Index price and some of the NGLs at OPIS price to its affiliate, OEMI, who in turn sold at the highest and best price to third parties. Class Members were entitled, at all times, to the highest and best price.

45.     Throughout the Class Period, OXY undertook to represent to Plaintiff and the Class, on a monthly basis on their check stubs, that a proper accounting had been made, without disclosing specific deduction types taken or their amounts.

46.     Throughout the Class Period, the only accounting OXY provided to royalty owners on a monthly basis was contained in the check stubs which come to royalty owners, using the same check stub format and the same check stub software for the respective time periods.

47.     The statute of limitations is tolled as a result of OXY's inequitable conduct and failure to disclose deductions which were not and could not have been reasonably ascertained from the check stubs OXY provided.

<u>**COUNT I—BREACH OF LEASE**</u>

48.     Plaintiff and the other Class Members incorporate by this reference the allegations in paragraphs 1- 47, and 54-66.

49.     Plaintiff and the other Class Members entered into written, fully executed, oil and gas leases with OXY, and those Class Leases (a) did not expressly authorize the deduction of midstream post-production costs (GCDTP), commonly known as Express Deduction Leases; (b) did include express provisions barring all or some deductions of midstream post-production costs (such as Express No Deduction lease addendums (END Leases) or Express Off-Lease Use Royalty Clauses); or, (c) the implied duty to market (IDM).

50.     All of the Class Leases include express or implied covenants requiring OXY to place the gas and its constituent parts in Marketable Condition at OXY's exclusive cost, and to obtain the highest and best reasonable price for the products.

51.     At all material times, Plaintiff and the other Class Members have performed

their terms and obligations under the leases.

52.     OXY breached the express and implied covenants of the Class Leases by its actions and/or inactions.

53.     As a result of OXY' breaches, Plaintiff and the other Class Members have been damaged through underpayment of the actual amounts due.

**COUNT II—UNJUST ENRICHMENT &**
**BREACH OF IMPLIED DUTY TO MARKET**

54.     Plaintiff and the other Class Members incorporate by this reference the allegations in ¶¶ 1-53, and 60-66.

55.     OXY voluntarily assumed the duty to market gas and pay royalty to persons with whom it had no lease but who are subject to a pooling order issued by the Oklahoma Corporation Commission ("OCC") which obligated OXY to pay the proper amount of royalty to these "force pooled royalty owners."

56.     OXY's practice of underpaying royalty, as specifically described above, harmed these force pooled royalty owners and unjustly enriched OXY because OXY kept the money that should otherwise have been paid to the force pooled royalty owners.

57.     Plaintiff pleads unjust enrichment as to those force pooled royalty owners because they have no lease with OXY and have no claim for breach of lease.

58.     Plaintiff does not seek disgorgement of OXY's profits from wrongfully withheld royalty. Instead, Plaintiff seeks the payment of money that should have been paid to the royalty owners under a lease (breach of lease claim) or under an OCC order (unjust enrichment claim).

59.    In addition, on or after May 8, 2012, the force pooled royalty owners were statutorily provided the implied duty to market, which was breached as set forth above.

## COUNT III-BREACH OF FIDUCIARY DUTY

60.    Plaintiff and the other Class Members incorporate by this reference the allegations in ¶¶ 1-58.

61.    Plaintiff and the Class Members have wells that have been unitized under 52 O.S. §§ 287.1-287.15 and/or 52 O.S. § 87.1.

62.    Until May 8, 2012, Oklahoma law recognized a fiduciary duty between a lessee and its lessors by virtue of the Oklahoma Corporation Commission (OCC) orders based on field-wide units or secondary recovery under 52 O.S. §§ 287.1-287.15 and/or for the creation of drilling and spacing units under 52 O.S. § 87.1. After May 8, 2012, 52 O.S. §902 took effect and eliminated this fiduciary duty for OCC orders that occurred after that date—and it is believed that all of the Class Wells in this case had OCC unitization orders before that date, certainly Plaintiff's well did. In addition, after May 8, 2012, 52 O.S. §87.1(e) provided for force-pooled royalty owners to have the "judicially recognized implied covenant to market," placing force-pooled royalty owners on the same playing field as royalty owners with leases having the implied duty to market.

63.    OXY was the unit operator by appointment from the Oklahoma Corporation Commission for Plaintiff's well and the Class Members' wells.

64.    OXY breached its fiduciary duty to Plaintiff and the Class Members by failing to properly report, account for, and distribute gas proceeds to Plaintiff and the Class Members for their proportionate royalty share of gas production.

65.     OXY's conduct in breaching its fiduciary duties to Plaintiff and the Class Members was done intentionally, maliciously, or in reckless disregard for the rights of Plaintiff and the Class Members.

66.     As a direct and proximate result of OXY's breach of fiduciary duty, Plaintiff and the Class Members are entitled to recover actual damages. Plaintiff reserves the right to re-plead for punitive damages after discovery in the event such is warranted by the evidence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an Order and Judgment against OXY as follows:

A.     Certifying this action as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiff as the class representative and Plaintiff's counsel as class counsel, with reasonable notice to be given to the Class Members;

B.     Awarding Plaintiff and the Class Members damages including, but not limited to, interest at the highest allowable rate (such as lawful, equitable, or internal rate of return);

C.     Granting Plaintiff and the other Class Members the costs of prosecuting this action, together with reasonable attorneys' fees out of the recovery; and,

D.     Granting such other relief as this Court may deem just, equitable and proper.

## JURY DEMAND

Plaintiffs and the other Class Members demand trial by jury regarding all issues

that can be tried to a jury under applicable law.

## <u>ATTORNEYS' LIEN CLAIMED</u>

Respectfully Submitted,


<u>/s/ Rex A. Sharp</u>
Rex A. Sharp OBA #11990
Barbara C. Frankland, OBA #33102
Rex A. Sharp, P.A.
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax
rsharp@midwest-law.com
bfrankland@midwest-law.com

AND

Reagan E. Bradford
The Lanier Law Firm, P.C.
431 W. Main Street, Suite D
Oklahoma City, OK 73102
(405) 698-2770
(405) 234-5506 fax
Reagan.Bradford@LanierLawFirm.com

AND

Michael E. Grant
Grant Law Firm, P.L.L.C.
512 N. 12th Street
Oklahoma City, OK 73103
(405) 232-6357
(405) 232-6358 fax
De1471@coxinet.net

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of February 2019, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECR registrants:

*/s/ Rex Sharp*
Rex Sharp